'Smyser, J.,
(orally).
James M. Ickes files his petition in error here to reverse the judgment of the court of. common pleas of'this ■county. In our investigation we have not had the indictment. It is not with the papers, nor is a copy of it set out ■anywhere in the bill of'exceptions; but as no question was *32 made on the indictment, we have considered the case in its absence.
At the January Term, 1897, of the court of common pleas of this county, the grand jury returned an indictment against the plaintiff in error, under sec. 6828. To this a plea of not guilty was entered; trial to a jury; verdict of guilty, and judgment upon the verdict; and it is this judgment that it is sought to review. A bill of exceptions is before us, embodying all the evidence taken in the trial below. I might as well say at the outset, that there is some question as to whether this case is properly before this court; but, as it. was not raised, the court feel like waiving that question. To call counsel’s attention to some sections of the statute, and some authorities may be valuable in the future. It is conceded that the offense charged here is a misdemeanor. Rees. 7356-7-8, provide for the prosecution of error in criminal cases. Sec. 7356 provides that judgments and final orders in criminal cases, and so on, may be reviewed on eiror.
“Sec. 7357: On application by; or on behalf of the accused to any officer whose duty it is to make a record or docket entries in any such ease, and tender of the proper fee, such officer shall make and deliver to the, accused or his counsel a complete certified transcript of the record, omitting, if so requested, any bill or bills of exceptions; or,'if the prosecution was before a court or tribunal in which a complete record is not made, a certified transcript of the judgment' and all entries in the case, and on receipt of a copy of a summons as hereinafter mentioned, shall forward to the clerk of the court the original papers in the case.
“Sec. 7358: The proceedings to review any such judgment shall be by petition in error, to which shall be attached such transcript, and also any original papers received by the clerk; except that in cases of felony it shall not be necessary to include in the transcript of the record any bill of exceptions, but the original bill of exceptions may be' attached in lieu of the transcript of the record *33 thereof. And the court in which the review is sought, may, by summary process, compel a more complete record to be furnished,and such original papers to be forwarded.”
It being conceded that this is a misdemeanor, it is very questionable whether there ought not to be a certified copy of this bill of exceptions attached to this petition in error. There is a case in 2 C. C., 129, where it is said:
“This court has no jurisdiction, under sec. 7356, (82 Ohio L., 39), to review a conviction and sentence in the court of common pleas, on a petition in error, unless there is attached to and filed with such petition in error, a complete certified transcript of the record in the case, as provided in sec. 7358, (80 O. L., 46).”
And in the 9 C. C., 315:
“The plaintiff in error seeking to reverse a judgment of the court of common pleas in a prosecution for a misdemeanor, should attach a transcript of the complete record to his petition in error, and if he fails to do so, the petition in error will be dismissed.”
But that question was not suggested to us, and therefore we will not dispose of the case on any such ground.
Numerous errors are assigned upon this record as a reason for the reversal of this judgment. The first error that was urged upon the court, and with much vehemence, was the refusal of the trial court to dispense with a jury and to conduct the trial by the court alone, and to have the court itself pass upon the guilt or innocence of the accused.
The second is, that the evidence is insufficient to warrant a conviction, principally upon the ground that it does not show that Ickes was the manager of the paper in which this alleged libel was published, at the time of its publication. And, incidentally, that this judgment is against the evidence. There are some other errors assigned, and we have gone through this entire record and looked at all of them. The first, as I have suggested, is the refusal of the trial court to dispense with a jury and to hear the testi *34 mony and pronounce judgment upon the evidence. Sec. 7301, provides:
“A person indicted for a misdemeanor may, upon his request in writing, subscribed by him and entered on the journal, be tried in his absence, or by the court.”
It is insisted that the word “may” used in the criminal code, and especially in this section, is equivalent to “must;” that when a privilege is accorded to an accused, if he sees fit to exercise his privilege, that that becomes mandatory upon the court, As this statute reads, it is clearly permissive. We are asked to put the construction upon it that it shall be mandatory; that it shall be peremptory upon the court, in case of a misdemeanor, where the accused in a writing subscribed by himself waives a jury trial, and asks to be tried by the court, that it thereupon becomes the right of the accused under such circumstances to have the court try him. We cannot subscribe to that view of this statute. If “may” is to be read “must”, •then we would have the curious anomaly of an accused, ■charged with a misdemeanor, subscribing in writing a re-quest to be tried by the court, compelling the court to accord him such a trial, although the accused is within the •call of the sheriff's voice from the court house, For if this privilege is to be accorded him at all events, he could absent himself from the court-room alone, and under such circumstances it would be the duty of the court to try him be■cause he is both absent and requesting the trial to be heard 'hy the court alone.
That cannot be true. It is not the practice. It has not ’been. This is discretionary with the court. It is a privilege that is accorded, that is true; and our view is, that this •provision embodied in the statute was for the purpose of •enabling the accused to waive, what he otherwise could not waive. That is its object and its purpose. When you lo.ok at the request made, it says: “I request.” If it is a right, *35 be could say: “I demand.” It is discretionary. The court is not bound or required to dispense with the services of a jury in the trial of a misdemeanor at the behest of the accused, but can exercise its discretion. In this case, the court having exercised its discretion and declined to try the case, we see no error in it.
Sec. 10, Art. 1, of the Bill of Rights, guarantees the-right of trial by jury to a defendant. The proposition here-contended for has never been decided in Ohio, at least no-authority is called to our attention, and we háve not been-able to find any such authority. But, the converse of the-proposition arising under this constitutional guarantee has. been before our courts in various shapes.
1th Ohio St., 57; 32 Ohio St., 439; 5th Ohio, 283.
The principle decided in these cases being, that under the circumstances of the particular case, the right of jury trial was not infringed by the action of the court, In 12th Ohio St., 622, the court hold that in felonies an accused cannot waive his right of trial by jury, The reasoning of the court in these cases strengthens us in the view that the object of sec. 7301, was to enable a person charged with a misdemeanor to simply waive his right of trial by jury, but that it does not infringe upon the discretion of the court clearly indicated in the section, to either grant or refuse such request. We are unable to see how the court accorded to the accused a trial by jury, such as is guaranteed him by the constitution, and being so tried, would occasion any prejudice to the accused whatever. And we, therefore, hold that there was no error in the refusal of the court to try the case without the intervention of a jury..
After this request to be tried by the court was overruled, the court ordered the jury called. Thomas B. Reece was called and examined, and after he is excused by the court, a challenge is interposed to the array, Mr. Reece is examined by counsel for the state, by counsel for the *36 accused, and the court propounds some interrogatories touching his qualification as a juror; and after that is concluded comes the challenge to the array. It is assigned, however, as error, that this juror was excused because of defective hearing. Secs. 7278, 7279, 5176, and 5177, determine the manner in which the jury shall be impaneled; and what I am saying in respect to this will apply largely to the challenge to the array. Sec. 7278: “Causes of ■challenge of jurors,” Paragraph 9: “The same challenges ■shall be allowed in criminal prosecutions that are allowed to parties in civil cases.”
“Sec. 7279: All challenges for cause shall be tried by the court, on the oath of the person challenged, or on other evidence, and shall be made before the jury is sworn. ”
Sec. 7278 says: The same challenges as are allowed in civil cases; and in civil cases we find the grounds for challenge in 5176 and 5177.
“Sec. 5177: Any petit juror may be challenged also on suspicion of prejudice against, or partiality for either party, or for want of a competent knowledge of the English language, or for any other cause that may render him at the time an unsuitable juror,and the validity of such challenge shall be determined by the court; and each party may peremptorily challenge two jurors.”
This record discloses that the real reason for the excusing of juror Reece was defective hearing. He clearly comes within the provisions of sec. 5177. It cannot prejudice this accused to have a man excused from the jury because be could not hear. He is just as much an improper person in the jury-box, — a man with defective hearing, — as a man who is .blind, or one who could not understand the English language. So that there is no error in that.
The challenge to the array comes after that. Clearly, the challenge to the array comes too late. They had entered upon the impaneling of the jury. Sec. 5175, is the *37 ■only section we have in respect to challenge to the array, ■and that provides:
“A challenge to the array may be made and the whole •array set aside by the court, when the jury, grand or petit, was not selected, drawn, or summoned, or when the officer •who executed the venire did not proceed, as prescribed by Jaw. But no challenge to the array shall be made or the whole array set aside by the court, by reason of the misnomer of a juror or jurors; but on challenge, a juror or jurors may be set aside by reason of a misnomer in his or their names, but such challenge shall only be made before the jury is impaneled and sworn, and no indictment ¡shall be quashed or verdict set aside for any such irregularity or misnomer, if the jurors who formed the same possessed the requisite qualifications to act as jurors.”
We think that while he had the right to challenge the •array, it comes too late by waiting until the impaneling of the jury had begun. Forsythe v. State, 6 Ohio, 6; also 23 Ohio St., 354. The reason assigned for the challenge ¡to the array is, that one of the jury commissioners who seJected the jury, and put the names in the box in this county, was not a freeholder. Counsel did not cite us any au•thority, but I will call attention in passing to the 24 Ohio St., 146. The court heard evidence on that subject; the record does disclose that he was a freeholder, but not a •freeholder in Ohio; and we are not cited to any authority that it is absolutely essential that the jury commissioners •should be freeholders of a freehold in Ohio. But, be that ¡as it may, he is in fact a jury commissioner, whether he •owns a foot of real estate or not. It would be a mere irregularity; and, in order to entitle the accused upon this ¡ground to have a new trial, and to reverse this judgment, prejudicial error must have intervened by reason of the refusal of the court to sustain his challenge to the array. We •cannot see, if there was the irregularity that I have indicated in this case, how any prejudicial error intervened in this respect.
*38 Upon the other question that is urged upon the attention of the court: The alleged libel is set out in the record. Although we have not seen the indictment, we take it for granted that it is alleged that this libel was published of and concerning W. O. Lyon; in fact, from this record, that admits of no discussion. It is shown by abundant evidence on the part of the State,that the prosecuting witness, W. O. Lyon, was intended and meant by the article; and, in the testimony of John A. Ohilcote, who purports to have written the article, finally, after having two or three times claimed his privilege upon the witness stand, withdraws his privilege and says, by way of answer: “I meant Lyon.” The accused himself upon the witness stand, says substantially the same thing. There were three distinct offenses charged in this libel. One was, that ‘‘Boss Bill” had been riding with some married lady of Newark,and, through inadvertence, left part of her clothes in the buggy when the buggy was returned. Another related to a transaction in Chicago. To use the ordinary term, and what the ordinary mind would understand by that article when he read it, — '‘‘bibulous time in Chicago,” would mean nothing more nor less than ‘‘a common drunk.” The other charge was a larceny committed in Chicago. These were the three-charges, — three distinct matters appearing in this alleged-libelous article. As I say, the record discloses that Lyon,, the prosecuting witness, was the person intended. ' As to-the falsity of these charges, we think there can be no room for doubt from this record. The gentlemen who were with-the prosecuting witness in Chicago, were upon the witness-stand, — William M. Hahn, Samuel J. Davis, Judge Lowery; the persons in charge of the train when he missed getting off the train at Newark, and rode on through to Zanesville, were before the court; they detail these circumstances, —how it happened. As to the other transaction, the prosecuting witness himself testifies to; and Kellar, the mam *39 from whom the horse and buggy was hired, and the man from whom it seemed, as claimed by the accused, that this story emanated. The publication being admitted, and the falsity proved, malice would be presumed; but, in order to. entitle the State to a recovery, and before it could ask a conviction of the accused at the hands of the jury, it would be necessary to show that Ickes was the responsible party in some way, for the libelous article. The State had a theory that he, to say the least, inspired the article; that if he did not inspire the article, he was the editor and the manager of that newspaper at the time the libel was published, and, by reason of the fact that he was such editor and manager, he would be responsible criminally, although he had neither written nor participated in any way in the publication of the libel, other than merely allowing it to. appear in the columns of his paper. The State, on the proposition that he was manager and editor, offered a good deal of proof. The State submitted to the jury the paper itself. It had at the head of its editorial column the name of “James M. Ickes” as “Editor.” Th6 State called several witnesses oh the proposition that he was manager_ Brown, Wilhelm; and also offered the record of the company. (The Tribune was published by a stock company at that time.) The record shows that in 1896, at the January meeting, the accused was made the editor and manager of that newspaper. He was also secretary and treasurer. In June, 1896, he resigned as secretary and treasurer. He made some statements to the board that he desired to be re lieved of employment, and that arrangement was agreed to; and at the nest meeting there was something done about that. But, be that as it may, soon after this June meeting, Chilcote, who, it was said, became, after the June meeting, the manager of that paper, died; and the State contended that, upon the death of Chilcote, whether Ickes was formerly re-elected manager or not, he, in fact, as *40 sumed the management of the paper, and his assuming the management of the paper was acquiesced in by the board of directors, and he was, in fact, the manager. I have already suggested what the record shows. Wilhelm was called. He was an employe there. On page 98, he says:
‘‘I was working for Mr. Iekes. Q. In'the Tribune? A. Yes, sir; for the Tribune. Q. Who employed you to work in the Tribune? A. Mr. Iekes wrote me a letter and wanted me to come down and work for him seveial weeks, and I did.” He says he has that letter yet. ‘‘A. I thought he was general managing editor and had control of the business at that time.” ‘‘He gave me instructions to have supervision of the circulation; I was to go out and solicit subscriptions,and make collections.” ‘‘He told me to go out and solicit subscriptions, and to find out how many copies each of the other papers had in the city, and to make a report, and also to make collections.” “Q. Do you know who was managing editor of that paper? If so, state who he was. Objected to. The Court: If he knows who was managing editor. A. Yes, sir. Q. Well, who was it? A. Mr. Iekes.”
I will call attention to Brown’s testimony on page 131. Brown was an employe there. ‘‘Q. Who was the managing editor of the paper? A. Joseph M. Iekes.”
Mr. Stasel, who was the president of this company, on page 32, says he doesn’t know, maybe Iekes was managing the thing there. ‘‘He had control,as I say, of the general mechanical part and business part of the office, I think, and did exercise such control, and furnished editorials for the paper.”
The defendant offered testimony tending to show that he was not the manager; that he was simply the editor; that his business and connection, and relation with that paper at the time this libelous article appeared was simply to furnish editorial matter, and he was responsible only for what appeared in the editorial columns. It is conceded that *41 'the alleged libel did not appear in the editorial column, but was in the local column. He claimed that one Cochran '¡had charge and control of the local columns.
This was all submitted to the jury, and we are asked to •^reverse this judgment as against the evidence.
Without taking up the time to read from this record, it 'does appear that a night or two before this article appeared, ■the prosecuting witness, who was running a newspaper, had made some observation about Chilcote, at which he took ■umbrage. On the night of the 4th of December, Chilcote and the accused were talking by telephone in respect to the article that appeared in “Daily American,” and about 'Chilcote answering that article, and it was suggested by Ickes that he ought to answer it; that it would be proper; and there was some inquiry made about Chicago. That was before the jury. On pages 273-4, Chilcote describes the scene there,and we are not prepared to say that the jury was not justified in giving credence to the testimony of Brown and Wilhelm,who,so far as this record discloses, appeared to be disinterested in this matter, rather than the versión that was given by Chilcote and the accused upon trial.
“Had you any talk with Ickes as to what appeared in the ‘American’, that was the immediate cause of this? Had you any consultation? A. I had talked to him over the telephone. “Q. Did you have a talk with him outside •of the telephone? A. No, sir; I didn’t.” “Q. I ask you, what his reply was when you told him you were going to answer it? A. Well, I think he said he thought he would if he was in my place. I think I asked him if Mr. Lyon wasn’t robbed in Chicago, in 1888, while attending the convention there. He said that Lyon had said that he was. ’ ’
And so it goes on, but I will not go through this at length. This talk occurred on the 4th of December. *42 Mr. Iekes must have expected a reply, and might naturally expect it to come through his paper; but,be that as it may, we think the jury were warranted in finding that he was= manager there from this evidence.
In addition to this, the record discloses the publication-of an article that is concededly libelous. It is vile. Its publication by a newspaper is under circumstances that make no person responsible for its publication. As part of the outfit of the office there is a dummy leading to the composition room, and it is claimed that anybody can go into the office, deposit in this dummy articles that are to appear in the paper, and they go by means of the dummy to the composition room where they are set in type, and nobody oversees or supervises the article; and, by reason of this claim, it is contended that there is no criminal responsibility. It is claimed in this case that Iekes did not write the article. He says he did not write it, knew nothing of it until he read it in the paper. Chilcote says he wrote it, and' that Iekes did not see it until after its publication. Chilcote signs his name to the article, and addresses the communication to the editor. He says that no person at the office saw it, except the man who set it in type. That her took it to the office, put it in the dummy, had it sent up to the composition room, and nobody connected with the-management of the paper had any knowledge of it, except the man who set it in type. And, it is contended that by reason of this condition of affairs, Iekes is not responsible-because he neither wrote the article, nor saw it until after its publication. Wilhelm, as a witness, says that he saw Iekes and Chilcote together in the office apparently examining a paper, and talking and laughing. One or the other of them said “this is a corker; it will fix him.” Chilcote is called as the chief witness for Iekes. He sheltered himself upon his privilege on the stand. Iekes offered himself as a witness, and, on being admonished by the court that *43 be might assert his privilege, on four or five. occasions he did assert his privilege, and refused to answer the interro.gatories propounded. This occurred in th9 presence of the jury, and it was for them to determine what credence they would give to their testimony. It was for the jury to dra;w their own conclusions and inference from what was occurring in open court. Under these circumstances, the jury would be warranted from the facts in finding that the whole truth ■as to the writing and publication of this article was not before them as claimed by the plaintiff in error.
There is another matter that I might suggest, and which, doubtless, occurred to the jury, and that is, if the claim of ■the accused was true, that he had no knowledge of this article, knew nothing about it until he read it in the paper, upon its appearance he would have been swift in disavowing Tesponsibility for its publication, and it would doubtless have occurred to him, being a newspaper man, that a retraction would be proper. But no such retraction or disavowing of responsibility occurred. Now, from these facts, all of which were before the jury, the jury was, in our opinion, clearly warranted in finding Iekes responsible for the publication.
The only remaining question is, was the^law properly charged to the jury in the findings as detailed in the record?
I read from the 46 Am. St., 629. This caséis a dear exposition of criminal responsibility for libelous|fpublications under circumstances as favorable as the plaintiff in error •could possibly have claimed it.
The charge to the jury stated fairly the claims of the State and the accused, and the legal principles^upon which a conviction can be had, if at all. It might be suggested that carelessness, even, is a ground for criminal responsibility in other cases. A man may be guilty of manslaughter *44 •where death occurs by reason of carelessness or gross neglect.
There is another matter that I might suggest: If the claim of the accused were true, — that he had no knowledge of this article; knew nothing about it until he read it in the paper, common decency would have suggested, upon its appearance, the prompt disavowal of responsibility. A retraction, to say the least. The editor or the manager of that newspaper could have said: “This article appeared there without knowledge on the part of the officers or the responsible head of that concern, without our consent; we do not approve it;: we retract; so far as we are concerned, we retract, and desire to repair whatever damage we have done.” But nothing of that kind.
We cannot say that the finding of the jury was against: the evidence. In fact I will go further: I will say that we feel that the finding of the jury in that respect was right,, in finding that he was manager and editor at this particular time. I read from 46 Am. St., 629:
“Knowledge of Manager or Proprietor of Newspaper-Defense.^ — The manager or proprietor of a newspaper isprima facie criminally liable for a libel published therein, and cannnot escape responsibility simply by showing that it was published without his knowledge or consent. He-must further show that the publication did not occur through any negligence or want of ordinary care on his, part.”
Page 632;
“This brings us to the most important question in the-case, and that is whether, under our statute, it is a defense for the proprietor or manager of a newspaper, when indicted for libel, to show that the libelouB article was published without his consent or knowledge. The statute provides that “if any person shall * * * publish or cause to be published of or concerning another any false or scandalous matter with intent to injure or defame such other person, upon conviction thereof (he) shall be punished etc.”
JB. Wcdght, G. D. Barrows, B. G. Smythe, for Plaintiff in Error.
T. W. Philipps, Prosecuting Attorney, S. M. Hunter, J. B. Jones, for Defendant in Error
It is claimed here that the evidence failed to show that there was a specific intent to injure and defame.
“The question then recurs as to whether the manager or proprietor of a newspaper can escape criminal responsibility solely on the ground that the libelous article was published without his knowledge or consent.” * * * “And it should be no defense that the publication was made without his knowledge or consent, unless it further appears that it did not occur through any negligence or want of.ordinary care on his part. One who furnishes tne means for carrying on, and derives profit from, the publication of a newspaper, and intrusts its management to servants or employes whom he selects and controls; may be said to cause to be published what actually appears, and should be held responsible therefor, whether he was individually concerned in the publication or not, if he did not exercise proper care and oversight over the business intrusted to his servants.”
And I might read on.
On the ground of “criminal carelessness,” — that is not an unfamiliar principle. Men are indicted for manslaughter by reason of careless conduct through which death results.
The charge, as given, we think covered the case fairly as made by the evidence.
We think the case was fairly tried; and, there being no error that we discover in this record, this judgment must be affirmed.